Our next case this morning is 25-1817 Gino Mario Rechia et al. v. Andrea J. Campbell et al. Counsel for the appellant, please. Good morning. Your Honors, may it please the Court, Richard Chambers Jr. representing the appellate Gino Rechia. I would like to reserve three minutes for rebuttal. You may. Thank you, Your Honor. So, Your Honors, as you know from my brief, this is a Second Amendment case. And the difference, I think, is that I'm asking you to consider that prior cases before this Court in First Circuit, Capon is one of them, I would suggest that it did not take into consideration the fact that when the Founders enacted the Bill of Rights in 1791, they had just fought a war. And I think that's very important because the soldiers that fought the war with respect to the Continental Army were citizen soldiers. And as I was driving into Boston this morning, I passed by the Bunker Hill Monument, which we know is Breeze Hill. But I think it's very important to take into consideration the fact that the Second Amendment specifically talks about a well-regulated militia and about the ability to keep the people safe from a tyrannical government. Back in the time of the war. I just have a question for you. Do you argue that we are not controlled by the outcome in Capon, or do you concede that Capon controls here? Well, I concede that there's stare decisis with respect to Capon, but I would say Capon erred in not considering the fact that ARs is what's being banned in Massachusetts. It's a civilian firearm, and that's a firearm that is not even the equivalent of the military. The average soldier in the military is armed with an M-16, which is— Counsel, if I could get an answer to Judge Dunlop's question. It is one thing to argue to us that we are not controlled by prior two circuit cases, which do seem to control. That's one thing. It's a different thing to make arguments, having conceded the law of the circuit controls here, because you are creating a record for the Supreme Court, and you are basically saying the Supreme Court is going to overrule the first circuit precedent in a series of cases that we all know are going up there, one of which I think is being argued this morning. So which of the two positions are you taking? Are you conceding that under the law of the circuit, your Second Amendment claim is foreclosed? No, Your Honor. I'm not. Okay. And your argument is that it is not foreclosed because Capon talked about private citizens bearing arms, and you want to talk about not just private citizens, but citizens operating either through a militia or other mechanisms against government tyranny. Is that correct? Partly, Judge. Okay. What did I miss? Okay. Capon talked about self-defense and that the AR was inherently dangerous and unusual, and I'm submitting that the Second Amendment was not primarily enacted for self-defense of the individual. However, what I'm saying is that the individual, when, if you look at Heller, Judge Scalia talked about self-defense. Then we got the Bruin decision that talked about looking back at history in plain language. And I'm stating that Capon did not take up the issue of the plain language of the Second Amendment with respect to a citizen's right not only for self-defense, but their right to stand up to the government. But it seems like Heller takes this on when it discusses Miller, the sawed-off shotgun case, and goes into great discussion, it seems to me, on that there's an aspect of the Second Amendment of what kind of weapons are allowed. And it says what was allowed were the small weapons used by militiamen in defense of a person in the home. Those were the same. Those used in defense of the person in the home are one and the same of the weapons that the militiamen were allowed to carry. And then goes on to say, and that's why M16 rifles and other such things are not covered. So while even if I accept, which I will for argument purposes, that this tyranny argument is correct, it merges with the self-defense argument based on the way that the court describes the Miller inquiry. Well, Judge, I would suggest Miller was more focused on the sawed-off shotgun, which is altering a firearm. It's taking a firearm that was designed one way and cutting it down and making it into something. But you can't just start from Miller from itself. You have to take Miller as Heller tells us what it's talking about. And what it's telling us is it's a limitation on the kinds of weapons that the Second Amendment covers. And it says those are the weapons of the militiamen. And then it says, what are those? Well, those are the weapons, and I'm just quoting, quote, used in defense of person in the home. Well, I would suggest that if you look at the historical, the history behind the Minuteman, that that's not correct. That's incorrect because, and I point this out in my brief, the British soldier was armed with a brown vest musket. That was the best technology at the time. When they went to Lexington and Concord to disarm the Minutemen, they were armed with the equivalent brown vest musket. It was equal, flintlock against flintlock. So why can't we have M16 rifles? That's the best thing. Well, I suggest we probably should, but I'm conceding that because it's a machine gun. And I'm not saying that the average citizen should have a machine gun. But why? I mean, just why? To stand up to the government, Your Honor. I mean, Heller seemed very clear on M16 rifles. They're specifically mentioned. Why? I mean, you don't just make things up when you're writing these opinions. So it must have some connection to the scope of the Second Amendment. And as I understand it, that's because those aren't the guns of a militiaman. And Justice Scalia acknowledges that creates a mismatch between the prefatory clause, which is your tyranny idea, and the rights clause. And he says, well, that's just how history has taken us. And then Clayton very clearly hopes that ARs are not self-defense guns. So why doesn't that logic follow? It doesn't follow because you're talking about two things. The self-defense of the individual versus the ability for a militia to stand up to a government, Your Honor.  But you have no response to the section of Heller that merges those as to one. Well, I do. I mean, if you look at the First Circuit in Colano, that talks about a stun gun that was not envisioned by the founding fathers. And that case states that the Second Amendment extends to all instruments that constitute bearable arms, Your Honor. And I would suggest that an AR-15, which is the civilian version, it's not a fully automatic firearm, that it would extend to that firearm. Because that firearm is in common use throughout the United States. But it's only in common use because in many places it's legal. But that, I mean, common use just means how many are out there, and because many places make it legal. But that doesn't really get to what Heller is talking about, which is, I mean, if we made M-16s legal, people would have them, right? Well, I'd suggest, Judge, that Miller v. Bonta out of California specifically talks about the AR-15. And that case specifically says that it's unconstitutional to ban that firearm. And then we have the New Jersey dissent, Peter Sheridan, 69 pages, talks about the AR-15 as banning it, not being constitutional. And this Court has said the opposite, right? I'm sorry? This Court has said- The Court did say the opposite, but Judge Sheridan said that that was not correct. But there's a finer point on the common use question, right? I mean, it's common use for lawful purposes. And that would seem to suggest that there might be some distinction between an M-16 and an AR. I recognize our First Circuit precedent here. But isn't that the issue that you're better driving at is the common use for lawful purposes? Your Honor, I'm stating that Congress could have banned it, and they did in fact try to ban it. And today it's not banned. The ban only went into effect for 10 years under President Clinton. And it was not renewed. But there's 16 million American citizens own an AR-15. And there's 20 to 25 million that have been sold. And 40 out of the 50 states do not ban these. And I would submit that it is unconstitutional in this state to ban the AR-15 for all of those reasons, because the Second Amendment, if you look at the plain text, specifically speaks about the militia. And I make the argument that when the British went to disarm the Minutemen, they were equally armed. And they could not, the Founding Fathers could not have foreseen 250 years in the future that the government would be banning the most commonly used rifle. But this just brings us back to, you know, you're arguing essentially that caping should be overruled, which isn't something that we can do as a panel. Well, what I'm saying is that it was not applied, taking into consideration the argument I'm making about the historical traditions. Thank you. Thank you, Your Honors. Good morning, Your Honors. Grace Golke, Assistant Attorney General, representing the defendants. And may it please the Court, I think I'd start with the language in Heller. I think the argument that Judge Aframe was pointing to, I think that is, well, I would say caping is dispositive, but even looking at just the argument that has been made in an attempt to distinguish caping, the only argument put forth is this argument about the prefatory clause of the Second Amendment. And Heller, I think, spoke quite directly to that, that there has developed a mismatch between the prefatory clause and the operative clause, but that it is the operative clause that determines the modern scope of the Second Amendment, and that that looks at that codified a preexisting right primarily aimed at self-defense of the individual. And that has been consistent in the Supreme Court's cases since Heller on the Second Amendment, through Bruin, McDonald, Rahimi, all of those cases spoke to the individual right to self-defense. And the language quoted earlier regarding instruments, I'm trying to find the language, but the instruments that constitute bearable arms, Bruin then added, that facilitates self-defense. So that is the scope that Bruin defined. Can you explain to me, and I think our cases, I'm just saying, I think our cases say it's a step-two problem. Why is this a, Bruin, step-two problem? If these guns are not the guns, as I read, Heller's construction of Miller, that are within the Second Amendment, why do we reach the historical tradition as opposed to them just being outside the scope of the Second Amendment? Your Honor, the Commonwealth defendants have argued previously in, I believe in Ocean State was Rhode Island, but in Capon, which was Massachusetts, did argue that the weapons banned were not arms within the meaning of step one of Bruin. The court declined to reach that question and assumed without deciding that they were. Did you just assume that? Yes. So is your contention that the AR-15 is not useful at all for self-defense, such that there's, so you're arguing it's not an arm? We took that position in Capon, I think for purposes of this appeal, it's not necessary. The court can, again, assume without deciding. But the Commonwealth's position has been that because they are neither suitable for or actually used in self-defense, and that was supported by an expert record in the Capon case regarding both actual use in self-defense, which was basically none, that were recorded, and then suitability for self-defense as compared to the sort of quintessential handgun or other types of weapons used in self-defense, that it met neither of those criteria. Now, I don't think that question is necessarily before this court, just given the methodological approach of the Capon court. So would that position mean that hunting weapons are not arms? Your Honor, I think hunting – Is that what you're trying to do? No, Your Honor. And I think hunting hasn't been squarely presented by any of the cases thus far. There is some discussion – But you're talking about self-defense. Yes, Your Honor. And self-defense, both Heller and then the later Supreme Court cases really did focus on self-defense. There is reference to hunting. And I think that an appropriate case might present that question of whether hunting is another lawful purpose protected by the preexisting codification of this Second Amendment right. It just hasn't been presented in the cases thus far, and AR-15 is not a hunting weapon, for reasons that were included in the expert declarations in the Capon case. I'm just curious, mostly because I just read an account from the Sandwich Historic Society in New Hampshire about a bunch of hunters who, in self-defense, went out with their hunting weapons, and there was a huge caribou which they finally managed to kill, but he was a menace to the hunters and to the community. Is self-defense good against wildlife that could endanger you or your community, or is it simply limited to people? Your Honor, frankly, we haven't briefed that issue. I thought there was a discussion in the case law about it. Yes, I think, Your Honor, there would need to be a factual record both on the historical understanding of that particular scenario and then how often or how useful certain weapons would be in that kind of situation. I just don't think we have the record to really decide that particular question. Oh, but surely colonial people didn't keep two or three different types of shotguns, some for people and some for moose or deer or turkey. Yes, Your Honor, understood. And there are many rifles and shotguns that are perfectly legal within the Commonwealth and that are used by hunters and other sportsmen within the Commonwealth. That really isn't at issue in this case today and was not at issue in Capon given the unique characteristics of the weapons that are banned by this law. I just want to understand the State's position. So is your position that an AR-15 is not useful at all for self-defense? There is no self-defense use. Is that the position? Your Honor, I think the focus of the Commonwealth's briefing has been on the vast disproportionate, the disproportionately offensive combat use for weapons of this design as opposed to self-defense. Okay, so that gets me then to my question, which is it's different to say that there is no self-defense use, which strikes me might be difficult to make that argument. But as long as you can see that there is some self-defense use, then what you're really doing is shifting into a burden shifting analysis, which, you know, how heavy is the burden? It isn't a terribly heavy burden because AR-15s aren't well suited for it or aren't used often for self-defense, in which case you seem to be importing the kind of means-end analysis that Heller was ending. Your Honor, I have two responses to that. First, I think any weapon could conceivably be used in self-defense, so it's just, I think, implausible to take the position that any type of weapon could never be used in self-defense. And so the key is, is it actually used? Is it useful? But on the second point— That's because there's a subset of weapons that are dangerous and unusual, and no matter what you can use them for, you can't have them, right? Right. That's correct, Your Honor. But looking at then the step two of Bruin, at the justification. So the Bruin itself instructs to look at what is the degree of burden on the right to self-defense, and that's different from an interest-balancing means-end scrutiny. I realize this is a kind of doctrinal question that has been difficult for many courts, but the Supreme Court has instructed courts to look at comparing the burden on self-defense of historical laws and then the burden on self-defense of the modern regime. And so necessarily the court— Why are we doing that? Is that because that's the line between a dangerous and unusual weapon and a protected weapon? I mean, why are we doing that? Well, Your Honor, that is the framework that Bruin laid out for any law that's implicating the Second Amendment. The dangerous and unusual then is a particular—the Supreme Court has not— Well, we have to do a—if we're into the Second Amendment step two, we're doing a historical analog. Yes. And so we're trying to figure out the how and the why, which is what Capon and Ocean Tactical do. And what I took the case to be is that because this has what you called a second ago, a disproportionate offensive use, that's what made it dangerous. Yes, Your Honor. I think that's one way to frame it, how these pieces fit together. I think courts are still determining exactly where to fit these pieces together. But the dangerous and unusual language that obviously comes from historical sources but then is applied in Heller to the M-16, that it's sort of fitting that together with then the general framework that Bruin laid out of the how and why and the how being the degree of burden on the right to self-defense. And I think part of that then for a dangerous or unusual weapon, which is how Rahimi has gone back to that original formulation of or, which is from the historical sources, that that ties in to then the degree of burden on self-defense. If something is a particularly dangerous or unusual weapon, it has less than restricting its use, has less burden on the right to self-defense than, for example, an outright prohibition on handguns. But I would say, Your Honors, that this case before you today can be decided simply based on the law of the circuit of Ocean State Tactical and CAPEN. I have one, I guess, curiosity question. You don't raise any third-party standing problem. I guess I wonder why. If it's an individual right, why does a seller get to assert the rights of third parties? Yes, Your Honor, we raise that as a step one Bruin concern as opposed to a standing concern, I think, because the allegations in the complaint, which we have to take as true for this stage, allege an economic injury that is, that provides standing in terms of. I mean, but not prudential third-party standing. Your Honor, I. You have to have an economic injury to have Article III standing. Yes. That's true. But you can't raise the rights of other people. There are exceptions. Maybe this falls into one. I was wondering if you had thought that through, or that just wasn't, you just didn't think of that, which is fine. We didn't present that argument, Your Honor. Okay. Unless the Court has any questions on the other two claims under the Commerce Clause and the 14th Amendment, the defendants would rest on their briefs on that.  Thank you, Your Honors. Thank you, Counsel. Just briefly, Your Honors, Judge Lynch brought up a good point of view about the hunters and the caribou and self-defense. And I would just like to say, if you look back at the traditional application, like we're supposed to do through Broome, and you look at the average minute man, the reason that he said they were called minute men, whether they were farmers or butchers or cannibals, because they could be ready in a minute, and they had a firearm hanging over the fireplace. They used that as a tool. That tool would be used for hunting, for self-defense, because back then they had Indians raiding from the French and Indian War and all that, and that's what part of the militia was to defend themselves. And I would suggest, Your Honor, that the Founding Fathers did not envision or could they look in a crystal ball and say 250 years in the future, the most commonly used firearm in the country is going to be banned. And I don't think that they would be for that, judges. So I'd just like to point that out. Thank you. Thank you. Thank you very much. All rise, please.